***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award, based on the record of the proceedings before the Deputy Commissioner, together with the Full Commission's Opinion and Award filed on March 2, 1999, and the record before the Commission at the time of that Award. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award of the Deputy Commissioner with minor modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured, with Key Risk Management Services, Inc., as its servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Judicial Notice is taken of the following, which are incorporated herein by reference as if fully set forth:
 a. Opinion and Award of Deputy Commissioner Dollar, filed on April 30, 1998 and amended on May 19, 1998,
 b. Full Commission Opinion and Award, filed on March 2, 1999,
c. Form 24 Application, filed on September 22, 1999,
 d. Administrative Decision and Order, filed on October 14, 1999, and
e. Defendant's Form 33 Request for Hearing.
5. The issues for determination are:
 a. Whether the defendant's Form 24 Application should be approved?
 b. Whether plaintiff refused work suitable to her capacity?
 c. Whether the plaintiff has engaged in workers' compensation fraud?
 d. Whether the defendant is entitled to have plaintiff pay its reasonable attorney's fees in this action?
6. The following exhibits were received into evidence at the Deputy Commissioner hearing held on March 20, 2000:
a. Medical Records, 106 pages,
 b. Defendant's Exhibit 1 Employee Health Report, eleven pages,
c. Defendant's Exhibit 2 Medical Evaluation Form,
 d. Defendant's Exhibit 3 Dr. Metcalf's Records, two pages,
e. Defendant's Exhibit 4 FCE Report,
 f. Defendant's Exhibit 5 Letter of Dr. A. Richie Lewis,
 g. Defendant's Exhibit 6 Dr. Scott Stewart's Records, two pages,
 h. Defendant's Exhibit 7 Dr. Kathleen Barfoot's Records, two pages, i. Defendant's Exhibit 8 Physical Therapy Notes,
j. Defendant's Exhibit 9 Videotape,
 k. Defendant's Exhibit 10 Statement of Attorney's Fees,
 l. Defendant's Exhibit 11 Plaintiff's letter to the Commission,
 m. Defendant's Exhibit 12 Plaintiff's letter to Defense Counsel,
n. Defendant's Exhibit 13 Investigator's Report,
o. Defendant's Exhibit 14 Surveillance Videotape,
 p. Defendant's Exhibit 15 ELC Investigative Services Report, and
 q. Defendant's Exhibit 16 Investigative Associates 
Consultants Report.
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following additional
 FINDINGS OF FACT
1. On or about January 13, 1999, plaintiff informed the employer's nurse that she was seeking treatment from Dr. J. Simmons Riggan, who had previously treated her compensable conditions and was her authorized treating physician. Plaintiff was seeing Dr. Riggan for problems with bilateral knee and hand pain. By March 16, 1999, plaintiff reported to her employer that Dr. Riggan was referring her to a rheumatologist for treatment for joint inflammation.
2. On April 22, 1999, rheumatologist Dr. Douglas Metcalf diagnosed plaintiff with musculoskeletal pain without an identifiable connective tissue disease. He recommended an arthritis evaluation. Plaintiff reported having fallen at home in March. She further expressed bitterness about work, which she believed precipitated her problems.
3. Following the May 12, 1999 Functional Capacity Evaluation (FCE), plaintiff was found capable of performing the sliver handler job. The report reflected that despite plaintiff's submaximal efforts, her physical capabilities exceeded those required to perform the sliver handler job.
4. Following the FCE, plaintiff continued to complain of bilateral elbow, hand and knee pain to her employer. She began complaining of trigger points and eventually informed her employer that she had fibromyalgia. She even carried in a stack of four textbooks on fibromyalgia to show her employer.
5. Plaintiff reached maximum medical improvement from the compensable left tendon injury and bilateral epicondylitis on August 26, 1999.
6. Dr. A. Richie Lewis, the defendant's occupational medicine consultant, reviewed the FCE and found the sliver handler job to be suitable to plaintiff's capacity. By letter dated August 26, 1999, he advised plaintiff that she was to return to work on September 3, 1999, with the restriction of no exposure to the 860 or 5,000 binders.
7. Rather than return to work as instructed, plaintiff instead went to Dr. Riggan. Plaintiff did not request permission to have an additional medical evaluation from either her employer or the Industrial Commission before the September 1, 1999, visit with Dr. Riggan. At the appointment, Dr. Riggan referred plaintiff to Dr. Metcalf for an evaluation for her complaints of multiple joint arthralgias and myalgias.
8. On September 16, 1999, Dr. Scott Stewart of Johnson Neurological Clinic saw plaintiff for complaints of pain, swelling in both hands, and knees buckling under her. Dr. Stewart referred plaintiff to Dr. Kathleen Barfoot for a chronic pain evaluation. However, the defendant notified plaintiff that Dr. Barfoot's treatment was not authorized.
9. Donna Ricketts completed a Form 24 Application to Suspend or Terminate Compensation on September 17, 1999, after plaintiff was released to return to work and failed to do so.
10. On September 24, 1999, Dr. Metcalf advised claims adjuster Donna Ricketts that plaintiff's pain problem conceivably could be fibromyalgia. However, Dr. Metcalf did not causally relate this condition to plaintiff's work.
11. Although plaintiff was aware that Dr. Barfoot's treatment was unauthorized, she did not make any effort to seek authorization from the Commission.
12. On January 14, 2000, Dr. Barfoot diagnosed plaintiff with myofascial pain syndrome and recommended physical therapy.
13. Although plaintiff continues to insist that she has fibromyalgia, competent medical evidence clearly established that the proper diagnosis is myofascial syndrome, based upon the American College of Rheumatology guidelines for diagnosis.
14. Dr. Barfoot initially related plaintiff's upper body myofascial syndrome to the carpal tunnel syndrome due to the history of onset which plaintiff provided. However, after learning that plaintiff had begun complaining of total body pain after the second carpal tunnel syndrome surgery, Dr. Barfoot opined that she could not state to a reasonable degree of medical certainty that plaintiff's inability to work was due to a work-related cause, particularly given plaintiff's fall at home in March of 1999.
15. Between September of 1999 and February of 2000, the defendants hired private investigators to conduct surveillance. Plaintiff was observed driving her sport utility vehicle for over five hours per day on many of these days. She worked in the yard and dwelling of rental properties which she and her husband owned. Plaintiff lifted and carried objects with no apparent distress.
16. Based upon plaintiff's ability to carry on sustained activities on a daily basis, as demonstrated in the surveillance reports and videotapes and Dr. Barfoot's medical findings, plaintiff was capable of returning to work.
17. Although Dr. Barfoot released plaintiff to return to work on February 14, 2000, plaintiff advised her that there was no work for her.
18. After being advised to return to work on September 3, 1999, plaintiff sought unauthorized medical treatment and failed to secure authorization from the Commission. Plaintiff deliberately and unjustifiably refused to accept work suitable to her capacity.
19. While plaintiff was engaging in high levels of activity away from the job between September 1999 and February 2000, she was writing lengthy letters to the defense counsel and the Commission to request additional benefits.
20. The Full Commission finds that based on the greater weight of the competent medical and lay evidence, plaintiff's minimum physical capacities were established in the functional capacity examination (FCE) performed on May 12, 1999, and that plaintiff was qualified for and capable of performing the sliver position that she was offered by defendant. Plaintiff was aware that sliver position required lifting of no more than 5 pounds.
 ***********
The foregoing findings of fact engender the following
 CONCLUSIONS OF LAW
1. The defendant is entitled to suspend plaintiff's indemnity benefits due to her unjustified and unauthorized failure to accept the sliver handler job on September 3, 1999. N.C.G.S. § 97-32.
2. The defendant is entitled to a credit for any overpayment of benefits after plaintiff's unjustified refusal to return to work on September 3, 1999.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 ORDER
1. Defendant shall suspend payment of indemnity benefits to plaintiff, effective September 3, 1999, and continuing until she returns to work. Defendant is entitled to a credit for overpayment of benefits.
2. Each side shall pay its costs. However, the defendant shall pay an expert witness fee of $200.00 to Dr. Kathleen Barfoot.
SIGNED this ___ day of May, 2002.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER